UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

VIRTUAL STUDIOS, INC.

     Plaintiff,

v.

BEAULIEU GROUP, LLC,

     Defendant.

CIVIL ACTION NO. 1:11-cv-359

CLC/Lee

JURY DEMAND

**DEFENDANT BEAULIEU GROUP, LLC'S REPLY TO
PLAINTIFF VIRTUAL STUDIOS, INC.'S RESPONSE TO
BEAULIEU'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant Beaulieu Group, LLC ("Beaulieu") hereby submits its Reply to Plaintiff

Virtual Studios, Inc.'s ("Plaintiff" or "Virtual") Response to Beaulieu's Statement of Undisputed

Material Facts ("Response"). Plaintiff's Response was filed on April 5, 2013 (D.I. 52).

I.    SUMMARY OF PLAINTIFF'S RESPONSE TO BEAULIEU'S STATEMENT OF
       UNDISPUTED MATERIAL FACTS

Plaintiff's purports to address each of the 92 undisputed facts set forth in Beaulieu's

Statement of Undisputed Material Facts ("SUMF"). In response to 53 of those facts, Plaintiff

admits there is no dispute. (See Response Nos. 1–13, 16, 18, 21, 23, 27–30, 32–34, 36, 43–47,

51–52, 55–58, 64–66, 68–69, 71–72, 74–76, 79, 84, 87–89, 91–92.) [1] In response to 21 of the

remaining 39 facts, instead of alleging facts in dispute, Plaintiff responds by raising immaterial

and/or irrelevant collateral issues in an attempt to manufacture a dispute, often without any

---

[1] Plaintiff purports to dispute Beaulieu's SUMF No. 9. Plaintiff's Response, however, merely
restates SUMF No. 9. SUMF No. 9 is thus undisputed.

citation of proof. (See Response Nos. 14–15, 17, 20, 22, 35, 37, 39, 40, 41, 54, 59–62, 70, 73, 78, 81, 83, 85.) Those statements should thus be deemed admitted.

The disputes raised by Plaintiff in response to each of the remaining 18 facts set forth in Beaulieu's SUMF are either not supported by evidence, or immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions. (See Response Nos. 19, 24, 25, 26, 31, 38, 42, 48, 49, 50, 53, 63, 67, 77, 80, 82, 86, 90.)

Beaulieu responds only to those statements that Plaintiff disputes, or in response to which Plaintiff raises immaterial and/or irrelevant collateral issues. For the convenience of the Court, Beaulieu reproduces below its Statement of Undisputed Material Facts and Plaintiff's response thereto, followed by Beaulieu's reply.

II.  GOVERNING AUTHORITY

Effective December 1, 2010, the Federal Rules of Civil Procedure were amended to specify the burdens of proof and persuasion assigned to the parties involved in a summary judgment motion. These amended provisions provide as follows:

(c) PROCEDURES.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

2

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c). Beaulieu, as the movant, has sustained its burden of establishing the undisputed facts. For the reasons explained below, Plaintiff has not sustained its burden in responding to Beaulieu's SUMF.

## III.   BEAULIEU'S REPLY TO SUPPORTED RESPONSES

13.     Mr. Farmer authored numerous room scene photographs between 2001 and 2009, Stella Decl. ¶ 47, Exh. SS, Farmer Tr. at 9:8–15; 11:8–15; 11:20–12:1; 12:19–13:3.

**RESPONSE:** Virtual disputes Beaulieu's thirteenth statement of undisputed material facts to the extent that it implies Mr. Farmer was the "author" of the room scene to the exclusion of Virtual, or that he somehow has or had ownership of the copyrighted images. At all times Mr. Farmer photographed room scenes for Virtual, he did so solely as Virtual's employee. Because he was Virtual's employee, Virtual is the "author" of the room scene as that term is used in 17 § U.S.C. 201.

Further, Virtual disputes Beaulieu's thirteenth statement to the extent that Mr. Farmer served as Virtual's principal photographer from 2001 - 2009. In his deposition Mr. Farmer stated that until 2006, his role in the photography of room scenes for Virtual was that of an "assistant." He primarily arranged the lighting for principal photographer Greg Wright, another Virtual

3

employee, and only "on occasion" took room scene photographs. (*Id.*) It was not until after Mr. Wright left Virtual in 2006 that Mr. Farmer became the principal room scene photographer for the company.

**REPLY:**  Virtual does not dispute that Mr. Farmer created numerous room scene photographs between 2001 and 2009.  Virtual admits that, until 2006, Mr. Farmer 'on occasion' took room scene photographs and that after Mr. Wright left Virtual in 2006, Mr. Farmer became the principal room scene photographer for the company.  Furthermore, Virtual does not dispute that it named Mr. Farmer in the "Name of Author" field on only a single purported copyright registration asserted in this case.  (See Beaulieu's SUMF No. 14; Stella Decl. ¶ 18, Exh. P, Copyright Registration VA 1-431-195 (DX 19) ("Name of Author" field includes the text "Virtual Studios Inc. Employer for Hire of Phil Farmer")).  Virtual states that "after Mr. Wright left Virtual in 2006 . . . Mr. Farmer became the principal room scene photographer for the company."  Beaulieu never argued and does not dispute, however, that Mr. Farmer was a "principal" photographer prior to 2006 because it is immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.  Moreover, although Virtual's statement that "Mr. Wright left Virtual in 2006" is supported by Mr. Farmer's testimony, that statement is inconsistent with Virtual's response to SUMF No. 19, which cites for support the Affidavit of Tom Sucher.  Despite Beaulieu's requests, Virtual has not produced any employment records for its photographers that would resolve the conflicting testimony of Virtual's witnesses.

Virtual disputes only the legal significance of calling Mr. Farmer the "author" of the images that he photographed.  This dispute is immaterial and not relevant or essential to the

resolution of this factual issue. Additionally, despite Beaulieu's repeated requests and Mr. Sucher's direct access to Virtual's employment records, Mr. Sucher has curiously declined to produce those records, which would confirm Mr. Farmer's employment status over the course of his employment with Virtual. Absent those records, Virtual has not demonstrated that Mr. Farmer was anything more than an independent contractor and thus the author and owner under the Copyright Act of the room scene images he photographed.

14.    Mr. Farmer is credited with authorship of approximately 233 room scene photographs that are the subject of a single registration, VA 1-431-195, all of which Virtual certified were created and published in January 2008. Stella Decl. ¶ 18, Exh. P, Copyright Registration VA 1-431-195 (DX 19).

**RESPONSE:** In response to Beaulieu's fourteenth statement of undisputed material facts, Virtual states that the copyright registration form in question speaks for itself. But Virtual again disputes any characterization of Mr. Farmer as the "author" of the room scene to the exclusion of Virtual, or that he somehow has or had ownership of the copyrighted images. At all times Mr. Farmer photographed room scenes for Virtual, he did so solely as Virtual's employee. Because he was Virtual's employee, Virtual is the "author" of the room scene as that term is used in 17 § U.S.C. 201.

**REPLY:** Virtual does not dispute that Mr. Farmer created the approximately 233 room scene photographs that are the subject of a single registration, VA 1-431-195, or that Virtual certified that all of those photographs were created and published in January 2008. Furthermore, Virtual does not dispute that it named Mr. Farmer in the "Name of Author" field on a single purported copyright registration asserted in this case. (See Beaulieu's SUMF No. 14; Stella

Decl. ¶ 18, Exh. P, Copyright Registration VA 1-431-195 (DX 19) ("Name of Author" field includes the text "Virtual Studios Inc. Employer for Hire of Phil Farmer")). Virtual fails to explain, however, why Mr. Farmer, though he created room scene images for Virtual from 2001 to the present, was credited in only a single copyright registration for 233 photographs that Virtual certified were all created and published in January 2008.

Virtual disputes only the legal significance of calling Mr. Farmer the "author" of the images that he photographed. This dispute is immaterial and not relevant or essential to the resolution of this factual issue. Additionally, despite Beaulieu's repeated requests and Mr. Sucher's direct access to Virtual's employment records, Mr. Sucher has curiously declined to produce those records, which would confirm Mr. Farmer's employment status over the course of his employment with Virtual. Absent those records, Virtual has not demonstrated that Mr. Farmer was anything more than an independent contractor and thus the author and owner under the Copyright Act of the room scene images he photographed.

15. Mr. Farmer and Mr. Sucher testified that Virtual has employed a total of at least nine full-time photographers since 1996. Stella Decl. ¶ 43, Exh. OO, November 13, 2012 Deposition of Thomas Sucher ("Sucher Tr.") at 50:21–51:14; Stella Decl. ¶ 47, Exh. SS, Farmer Tr. at 13:4–15:2; Stella Decl. ¶ 46, Exh. RR, Clay Tr. at. 138:2–139:15.

**RESPONSE:** In response to Beaulieu's fifteenth statement of undisputed material facts, Virtual does not dispute that it employed multiple individuals to work in the area of photography between 1999- 2009. But Virtual disputes this statement to the extent that it implies that Virtual employed nine or more principal photographers to photograph room scenes during this period.

20742497.1

Mr. Sucher, Mr. Farmer, and Ms. Clay did not testify to that fact in the portions of their depositions to which Beaulieu cites.

**REPLY:**  Virtual does not dispute that it has employed a total of at least nine full-time photographers since 1996.  Virtual disputes this statement only to the extent that those photographers were "principal photographers."  The title "principal" is not material to determining which person took the photographs covered by the registration statements.  Beaulieu neither argued nor implied, however, that Virtual employed nine "principal" photographers because it is immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.

Furthermore, Virtual's statement that "Mr. Sucher, Mr. Farmer, and Ms. Clay did not testify to that fact in the portions of their depositions to which Beaulieu cites" is wrong. Although each witness on his own did not name all nine photographers, the combined testimony of Mr. Sucher, Mr. Farmer and Ms. Clay supports Beaulieu's SUMF No. 15.

17.  Virtual identified Mr. Wright as the author of only the 251 room scene photographs covered by Copyright Registration 1-431-032.  Stella Decl. ¶ 16, Exh. N, Copyright Registration VA 1-431-032 (DX 17).

**RESPONSE:** Virtual denies Beaulieu's seventeenth statement of undisputed material facts. First, Virtual states that the copyright registration form in question speaks for itself. Second, this registration form lists the "Author" as "Virtual Studios," and notes Greg Wright's name only insofar as he was an "employee for hire" of Virtual. Third, Virtual disputes this statement to the extent that it implies that Mr. Wright was the "author" of these room scenes to the exclusion of Virtual, or that he somehow has or had ownership of the copyrighted images.

20742497.1

At all times Mr. Wright photographed room scenes for Virtual, he did so solely as Virtual's employee. Because he was Virtual's employee, Virtual is the "author" of the room scene as that term is used in 17 § U.S.C. 201.

**REPLY:** Virtual does not dispute that it certified Mr. Wright as the creator of the 251 room scene photographs listed in Copyright Registration 1-431-032. Furthermore, Virtual does not dispute that it named Mr. Wright in the "Name of Author" field on that registration, and on no other registration. (See Beaulieu's SUMF No. 14; Stella Decl. ¶ 16, Exh. N, Copyright Registration VA 1-431-032 (DX 17) ("Name of Author" field includes the text "Virtual Studios Inc. Employer for Hire of Greg Wright")).

Virtual disputes only the legal significance of calling Mr. Farmer the "author" of the images that he photographed. This dispute is immaterial and not relevant or essential to the resolution of this factual issue. Additionally, despite Beaulieu's repeated requests and Mr. Sucher's direct access to Virtual's employment records, Mr. Sucher has curiously declined to produce those records, which would confirm Mr. Wrights's dates of employment and status (e.g., independent contractor, freelancer, or employee for hire) over the course of his employment with Virtual. Absent those records, Virtual has not demonstrated that Mr. Wright was anything more than an independent contractor and thus the author and owner under the Copyright Act of the room scene images he photographed.

19.     Mr. Wright left his job at Virtual in 2006. Stella Decl. ¶ 47, Exh. SS, Farmer Tr. at 15:6–14.

**RESPONSE:** In response to Beaulieu's nineteenth statement of undisputed material facts, Virtual admits that Philip Farmer testified in his deposition that he though Mr. Wright left

his employment at Virtual in late 2006. However, Virtual denies that this is the only evidence about Mr. Wright's employment dates. Mr. Sucher stated in his affidavit that Mr. Wright did not finish his employment with Virtual until sometime in 2008.

**REPLY:** Virtual's response does not overcome these facts. In its Response to Beaulieu SUMF No. 13, Virtual states that "Mr. Wright left Virtual in 2006," which is supported by the deposition testimony of Mr. Farmer, who testified that he became Studio Manager in November or December 2006, after Mr. Wright left his employment at Virtual. This is inconsistent with Virtual's Response to SUMF No. 19, which is based on the affidavit of Mr. Sucher. Beaulieu will be moving to strike this sham affidavit, which attempts to create a genuine dispute of material fact by contradicting the deposition testimony. Despite Beaulieu's requests, Virtual has not produced any employment records that would contradict the testimony of Mr. Farmer.

20.     Virtual built its room scene image catalog by photographing model homes and the creations of interior designers, and by purchasing room scene images from other companies, such as Crown Craft. (Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 41:15–51:22.)

**RESPONSE:** In response to Beaulieu's twentieth statement of undisputed material facts, Virtual admits that it obtained room scenes in the manners Beaulieu describes, but denies that these were the only methods it used to do so. Virtual also obtained room scenes by photographing such scenes in its own studio.

**REPLY:** Beaulieu does not dispute that, in addition to the methods identified in SUMF No. 20. Virtual photographed room scenes in its own studio.

20742497.1

22.     Mr. Sucher testified that Crown Craft transferred to Virtual by written agreement copyright ownership in 15 room scene images, which Virtual then added to its room scene catalog.  Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 46:20–48:11.

**RESPONSE:** Virtual does not dispute Beaulieu's twenty-second statement of undisputed material facts insofar as it says Virtual obtained a few room scenes from Crown Craft. However, Mr. Sucher indicated that the number "15" was only an approximation of how many room scenes Virtual obtained from Crown Craft.

**REPLY:**  Beaulieu does not dispute that Mr. Sucher estimated the number of room scene images Virtual obtained from Crown Craft.  Virtual's response does not overcome these facts. Despite Beaulieu's request, Virtual has failed to produce any written agreement transferring copyright ownership of those images from Crown Craft to Virtual.  Furthermore, in the cited portion of the deposition transcript, Mr. Sucher testified that Crown Craft did not provide any evidence that it owned the images it purportedly sold to Virtual.

23.     Mr. Sucher and Ms. Clay testified that Virtual has a number of those agreement records but they have not been produced in response to Beaulieu's requests.  Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 45:14–17; Stella Decl. ¶ 46, Exh. RR, Clay Tr. at 135:11–137:3.

**RESPONSE:** In response to Beaulieu's twenty-third statement of undisputed material facts, Virtual acknowledges that it did not provide Beaulieu releases from premises owners as part of its discovery responses. After reviewing Beaulieu's statement, however, Virtual was able to locate some of these documents and has since provided Beaulieu with copies.

20742497.1

Case 1:11-cv-00359   Document 58   Filed 04/25/13   Page 10 of 58   PageID #: 1993

**REPLY:**  Virtual produced documents Bates-numbered VS BEAU 0007913–40 on April 4, 2013, more than two months after the February 1 close of fact discovery.  Beaulieu will file a Motion to Exclude those and other late-produced documents at a later date.

24.     Virtual and Beaulieu conducted business in the same manner for eleven years without any mention of a one-year limitation on Beaulieu's use of room scene images.  Stella Decl. ¶ 44, Exh. PP, November 27, 2012 Deposition of Bruce Stern ("Stern Tr.") at 38:20–25, 91:16–94:17; Stella Decl. ¶ 45, Exh. QQ, November 27, 2012 Deposition of Wendy Jaynes ("Jaynes Tr.") at 14:19–22, 34:18–35:5, 37:6–38:7, 42:11–43:1.

**RESPONSE:** Virtual disputes Beaulieu's twenty-fourth statement of undisputed material facts. The parties began doing business with each other in 1997, and the invoices Virtual sent Beaulieu with Virtual room scene images contained an explicit one-year term of use:



Terms and Conditions

1.   Virtual Studios will provide its Client with the unlimited use of all photographs for a period of one year from the day of completion and payment of services as stated below.                    9

Further, Virtual discussed the one-year term of use of its images with Beaulieu as early as 2000. (Sucher Dep. at 237:2-8.)

**REPLY:**  Virtual's response does not overcome the evidence.  The portion of Mr. Sucher's deposition transcript cited by Virtual is unrelated to any discussion of the purported one-year license term and thus does not support its statement.  Furthermore, Mr. Sucher testified at deposition that *he has no recollection* of discussing Virtual's purported Terms and Conditions with Mr. Stern or Mr. Ruble:

20742497.1

> Q: And at the time that you started working with Beaulieu back in 1996, as alleged --
>
> A: Seven.
>
> Q: -- or 1997, sorry, as alleged in the complaint, did you sit down with Mr. Stern or with Sam --
>
> A: Sam Ruble, that's his name.
>
> Q: Okay. Great -- Mr. Ruble, and review the terms and conditions found in Exhibit 4?
>
> A: **I'm not sure whether I did or not.**

(See SUMF ¶ 25; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.) Moreover, it is clear from the portion of Mr. Sucher's testimony cited by Virtual in its responses to SUMFs 25 and 26 that Mr. Sucher does not recall any particular relevant discussion with anyone from Beaulieu in 2000 or at any other time—he merely names people he believes could have been involved in such a discussion. Virtual has not proven that any such discussion took place.

25.     Virtual's President, Mr. Sucher and his current Accountant/former Production Manager, Heather Clay, testified that they do not recall ever discussing a one-year limitation with anyone from Beaulieu. Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2; Stella Decl. ¶ 46, Exh. RR, November 14 & 30, 2012 Deposition of Heather Clay ("Clay Tr.") at 15:18–17:22, 87:1–12.

**RESPONSE:** Virtual disputes Beaulieu's twenty-fifth statement of undisputed material facts. The parties began doing business with each other in 1997, and the invoices Virtual sent Beaulieu with Virtual room scene images contained an explicit one-year term of use. Further, Virtual discussed the one-year term of use of its images with Beaulieu as early as 2000.

**<u>REPLY:</u>** Virtual's response does not overcome these facts. Virtual does not dispute that Ms. Clay has no recollection of ever discussing a one-year limitation with anyone from Beaulieu. Furthermore, by Virtual's own admission, during the first two years of the parties' business

relationship, the purported Terms & Conditions were listed on the back of Virtual's invoices *even though they did not apply to the invoiced work: digitizing room scene photos that belonged to Beaulieu*. Also by Virtual's own admission, those Terms & Conditions did not explain Virtual's purchase options for Virtual's room scenes. Beaulieu has established that none of its employees had any knowledge of the purported one-year license term. Indeed, Mr. Sucher, himself, testified at deposition that *he has no recollection* of discussing Virtual's purported Terms and Conditions with anyone at Beaulieu, including Mr. Stern or Mr. Ruble:

> Q: And at the time that you started working with Beaulieu back in 1996, as alleged --
> A: Seven.
> Q: -- or 1997, sorry, as alleged in the complaint, did you sit down with Mr. Stern or with Sam --
> A: Sam Ruble, that's his name.
> Q: Okay. Great -- Mr. Ruble, and review the terms and conditions found in Exhibit 4?
> A: **I'm not sure whether I did or not.**

(See SUMF ¶ 25; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.) Moreover, it is clear from the portion of Mr. Sucher's testimony cited by Virtual that Mr. Sucher does not recall any particular relevant discussion with anyone from Beaulieu in 2000 or at any other time—he merely names people he believes could have been involved in such a discussion. Virtual has not proven that any such discussion took place.

     26.     Virtual first raised its assertion of a one-year term to Beaulieu in 2008, when it notified Beaulieu of its copyright infringement allegations. Stella Decl. ¶ 44, Exh. PP, Stern Tr. at 46:25–47:21; Stella Decl. ¶ 45, Exh. QQ, Jaynes Tr. at 43:22–44:2; Stella Decl. ¶ 42, Exh. NN, January 10, 2013 Deposition of Patricia Flavin ("Flavin Tr.") at 66:8–14.

**RESPONSE:** Virtual disputes Beaulieu's twenty-sixth statement of undisputed material facts. The parties began doing business with each other in 1997, and the invoices Virtual sent Beaulieu with Virtual room scene images contained an explicit one-year term of use. Further, Virtual discussed the one-year term of use of its images with Beaulieu as early as 2000.

**<u>REPLY:</u>** Virtual's response does not overcome these facts. By Virtual's own admission, during the first two years of the parties' business relationship, the purported Terms & Conditions were listed on the back of Virtual's invoices *even though they did not apply to the invoiced work: digitizing room scene photos that belonged to Beaulieu*. Also by Virtual's admission, those Terms & Conditions did not explain Virtual's purchase options for Virtual's room scenes. Beaulieu has established that none of its employees had any knowledge of the purported one-year license term. Indeed, Mr. Sucher, himself, testified at deposition that *he has no recollection* of discussing Virtual's purported Terms and Conditions with anyone at Beaulieu, including Mr. Stern or Mr. Ruble:

> Q: And at the time that you started working with Beaulieu back in 1996, as
>    alleged --
> A: Seven.
> Q: -- or 1997, sorry, as alleged in the complaint, did you sit down with Mr. Stern
>    or with Sam --
> A: Sam Ruble, that's his name.
> Q: Okay. Great -- Mr. Ruble, and review the terms and conditions found in
>    Exhibit 4?
> A: **<u>I'm not sure whether I did or not.</u>**

(See SUMF ¶ 25; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.) Moreover, it is clear from the portion of Mr. Sucher's testimony cited by Virtual that Mr. Sucher does not recall any particular relevant discussion with anyone from Beaulieu in 2000 or at any other time—he

14

20742497.1

Case 1:11-cv-00359   Document 58   Filed 04/25/13   Page 14 of 58   PageID #: 1997

merely names people he believes could have been involved in such a discussion. Virtual has not proven any such discussion took place.

Perhaps the strongest single piece of evidence that Beaulieu indeed had no knowledge of the purported one-year license term is Mr. Stern's stunned response to Mr. Sucher in an August 29, 2008 email, shortly after Virtual first notified Beaulieu of its copyright infringement allegations. Mr. Stern stated:

> Let me comment on time frame limitations. I do not subscribe to time frame limitations for the use of our products in your room scenes. I do not agree that we should have to pay anything again to use the image indefintely [sic]. If that is your position we will have to reevaluate our relationship.

(Stella Decl. ¶ 19, August 2008 Sucher-Stern email chain (DX 22).)

28. The relationship between Virtual and Beaulieu was forged by Virtual President Thomas Sucher and Beaulieu Art Director Bruce Stern. Stella Decl. ¶ 44, Exh. PP, Stern Tr. at 33:16–34:13; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:3–10.

**RESPONSE:** Virtual does not dispute Beaulieu's twenty-seventh statement of undisputed material facts, though it is important to note that Sam Ruble was one of Virtual's first contacts at Beaulieu along with Bruce Stern.

**REPLY:** Beaulieu does not dispute that Mr. Ruble may have been in contact with Virtual in the early stages of the relationship between the parties. Beaulieu does dispute, however, that this is "important to note." Virtual's response does not overcome these facts. As discussed above, by Virtual's own admission, during those early stages (i.e., the first two years) of the parties' business relationship, the purported Terms & Conditions were listed on the back of Virtual's invoices *even though they did not apply to the invoiced work: digitizing room scene photos that belonged to Beaulieu.*

20742497.1

Mr. Sucher, himself, testified at deposition that *he has no recollection* of discussing

Virtual's purported Terms and Conditions with anyone at Beaulieu, including Mr. Stern or Mr.

Ruble:

> Q: And at the time that you started working with Beaulieu back in 1996, as
>    alleged --
> A: Seven.
> Q: -- or 1997, sorry, as alleged in the complaint, did you sit down with Mr. Stern
>    or with Sam --
> A: Sam Ruble, that's his name.
> Q: Okay. Great -- Mr. Ruble, and review the terms and conditions found in
>    Exhibit 4?
> A: **<u>I'm not sure whether I did or not.</u>**

(See SUMF ¶ 25; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.)  Moreover, it is clear

from the portion of Mr. Sucher's testimony cited by Virtual that Mr. Sucher does not recall any

particular relevant discussion with Mr. Ruble or anyone else from Beaulieu in 2000 or at any

other time—he merely names people he believes could have been involved in such a discussion.

Virtual has not proven that any such discussion took place.

      31.     Virtual then began to supply its own room scenes, which Beaulieu also purchased.

Sucher Tr. at 53:7–61:23.

**RESPONSE:**  Regarding Beaulieu's thirty-first statement of undisputed material facts,

Virtual does not dispute that shortly after the parties began their business relationship, it began

supplying Beaulieu with original room scenes. However, Beaulieu disputes that Beaulieu

"purchased" these room scenes from Beaulieu outright. The invoices Virtual sent Beaulieu with

Virtual room scene images contained an explicit one-year term of use, and Virtual discussed the

one-year term of use of its images with Beaulieu as early as 2000. Further, Beaulieu chose to use

Virtual's room scenes under the terms of "Option 3," a limited license that permitted

nonexclusive use of a room scene for a one-year period, and required Beaulieu to hire Virtual for any further manipulations to the scene.

**REPLY:** As discussed above, by Virtual's own admission, during the first two years of the parties' business relationship, the purported Terms & Conditions listed on the back of Virtual's invoices did not apply to the invoiced work. Also by Virtual's own admission, those Terms & Conditions did not explain Virtual's purchase options. Beaulieu has established that none of its employees had any knowledge of the purported one-year license term. Indeed, Mr. Sucher, himself, testified at deposition that *he has no recollection* of discussing Virtual's purported Terms and Conditions with anyone at Beaulieu, including Mr. Stern or Mr. Ruble:

> Q: And at the time that you started working with Beaulieu back in 1996, as alleged --
> A: Seven.
> Q: -- or 1997, sorry, as alleged in the complaint, did you sit down with Mr. Stern or with Sam --
> A: Sam Ruble, that's his name.
> Q: Okay. Great -- Mr. Ruble, and review the terms and conditions found in Exhibit 4?
> A: **I'm not sure whether I did or not.**

(See SUMF ¶ 25; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.) Moreover, it is clear from the portion of Mr. Sucher's testimony cited by Virtual that Mr. Sucher does not recall any particular relevant discussion with anyone from Beaulieu in 2000 or at any other time—he merely names people he believes could have been involved in such a discussion. Virtual has not proven that such a discussion actually took place.

Virtual's allegation that "Beaulieu chose to use Virtual's room scenes under the terms of 'Option 3,' a limited license that permitted nonexclusive use of a room scene for a one-year period, and required Beaulieu to hire Virtual for any further manipulations to the scene," is false.

17

Virtual has conceded that its purported "Options" are not described in its Terms & Conditions, and that those Terms & Conditions apply to only one of those purported options. Virtual has acknowledged that in the course of the parties' 15-year business relationship, Beaulieu *never* purchased any room scene under Option 1 or 2. That is because Beaulieu had no knowledge that such options existed. Moreover, Virtual concedes that its purported Terms & Conditions neither expressly nor impliedly include a prohibition against manipulation of its images, but argues that "Virtual interpreted the paragraph in question [¶ 4 of the T&C] so as to include a prohibition on manipulation." Virtual's misunderstanding and misinterpretation of its own T&C does not change the fact that nothing in those T&C imposed such a restriction on its customers' use of its room scene images. (See *infra* Response to SUMF No. 63 in which Virtual concedes that its T&C does not prohibit room scene manipulation, yet states without support or proof that there is nevertheless "prohibition against manipulation under Option 3.")

Virtual disputes that Beaulieu "'purchased' these room scenes outright." The evidence supports that Beaulieu understood that it had unlimited use of all room scene images until August 2008, when Virtual first raised its allegations of copyright infringement. This dispute is thus immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.

35.     The delivery receipt contained no information relating to pricing or terms and conditions. Stella Decl. ¶ 49, Exh. UU, 7/10/06 Delivery Receipt (VS-BEAU 0002318); Stella Decl. ¶ 50, Exh. VV, 1/03/07 Delivery Receipt (VS-BEAU 0002512); Stella Decl. ¶ 51, Exh. WW, 4/04/06 Delivery Receipt (VS-BEAU 0002290); Stella Decl. ¶ 52, Exh. XX, 10/21/09 Delivery Receipt (VS-BEAU 0002762).

**RESPONSE:** Virtual disputes Beaulieu's thirty-fifth statement of undisputed material facts. The delivery receipts signed by Beaulieu employees typically listed the job number with which the receipts were associated. For example, the receipt Beaulieu identified in its Exhibit UU – VS-BEAU 0002318 – listed Virtual Job Number 16793. This Job Number, in turn, was "related to" a specific invoice Beaulieu received that contained references to pricing and Virtual's terms and conditions.

**REPLY:** Virtual's response does not overcome the facts. Virtual does not dispute that the delivery receipt, itself, contained no information relating to pricing or terms and conditions. That the receipt "typically" listed a job number that "'related to' a specific invoice" received by Beaulieu's accounting department "that contained references to pricing and Virtual's terms and conditions" is an admission that the alleged pricing and terms and conditions were not found on the delivery receipt, but only on the invoice.

37.     None of the CDs, DVDs or files were ever labeled "Virtual Studios." Stella Decl. ¶ 7, Exh. E, Compact Disc, file contents and file properties (DX 8); Stella Decl. ¶¶ 30–32, Exhs. BB–DD, 11/19/07 Clay-Floyd emails (DX 34–36); Stella Decl. ¶ 46, Exh. RR, Clay Tr. at 61:20–65:2, 68:21–70:1, 70:19–75:14; Stella Decl. ¶ 45, Exh. QQ, Jaynes Tr. at 13:2–14:18, 34:4–14; Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 46:15–47, 69:25–70:6; 71:1–13.

**RESPONSE:** Virtual does not dispute Beaulieu's thirty-seventh statement of undisputed material facts insofar as it describes appearance of discs and files Virtual gave to Beaulieu. But it does dispute this statement to the extent that it implies Virtual's conduct was substantially different from that of other companies in the room scene business. According to Mr. Stern, most if not all of the discs in Beaulieu's room scene library were unlabeled regardless of their source.

Further, it was Mr. Stern that decided to "rename" Virtual's room scenes "to suit [his] filing system," not Virtual.

**REPLY:** Virtual's response does not overcome the facts. Virtual does not dispute that it never labeled as property of Virtual Studios the CDs, DVDs or files it sent to Beaulieu. Furthermore, Virtual's statement that "[a]ccording to Mr. Stern, most if not all of the discs in Beaulieu's room scene library were unlabeled regardless of their source," is inaccurate. It is not clear whether Mr. Stern's testimony regarding unlabeled discs was directed only to discs Beaulieu received from Virtual, and thus unrelated to other vendors. Stern Tr. at 12:4–14:14.

More importantly, it is immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions whether other vendors' CDs were labeled, or whether Mr. Stern or anyone else at Beaulieu renamed the room scene files. Virtual chose not to label its CDs, Virtual chose not include any information in the original file names that identified those files as Virtual's, and Virtual chose to omit any copyright notice on the images or CDs.

Without citing any support or proof, or explaining why it is relevant, Virtual disputes this statement "to the extent that it implies Virtual's conduct was substantially different from that of other companies in the room scene business." The conduct of other companies is not at issue in this case, and is thus immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.

38. Virtual also supplied Beaulieu with a hard copy of a catalog that included a blended assortment of Virtual and Beaulieu room scene images (Stella Decl. ¶ 5, Exh. C, Coronet Room Scenes (DX 5)), and a second catalog containing only Virtual Images (Stella

20742497.1

Decl. ¶ 6, Exh. D, Virtual Image Catalog (DX 7)). None of the images in either catalog was

identified by ownership, or included any notice of copyright. Stella Decl. ¶ 43, Exh. OO, Sucher

Tr. at 53:7–61:23, 77:8–84:1, 86:21–87:1.

**RESPONSE:** Virtual disputes Beaulieu's thirty-eighth statement of undisputed material

facts. Indicia of ownership, such as Virtual's logo and trade name, are located in various places

throughout the Virtual Image Catalog referenced in Beaulieu's statement. For example, this is the

cover of the Catalog in question attached as Exhibit D to Ms. Stella's Declaration:



And this is one of the pages in Beaulieu's Exhibit D, which is substantially similar to all the

other pages in the Catalog displaying Virtual's room scenes:



B0001245

**REPLY:** Virtual's response does not overcome the facts. Virtual does not dispute that it supplied Beaulieu with a hard copy of a catalog that included a blended assortment of Virtual and Beaulieu room scene images, and a second catalog containing images that originated with Virtual. Nor does Virtual dispute that none of the images in either catalog included any notice of copyright.

Virtual argues that its logo and trade name in one of the catalogs indicates Virtual's ownership of those images, while ignoring that the second catalog, which contains a blended assortment of Beaulieu and Virtual images, is similarly labeled with Beaulieu's "Coronet" logo and trade name.

22

The following is the cover of the catalog assembled by Virtual that contains a blended assortment of Beaulieu and Virtual images (Stella Decl. ¶ 5, Exh. C, Coronet Room Scenes (DX 5)):



And this is a page from that catalog, which is substantially similar to all the other pages, which includes both Beaulieu and Virtual room scenes:



Mr. Sucher testified regarding page 2 above, "These other images too, these were our [Virtual's] images. So not every one on here is a Beaulieu image." (Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 55:11–17.) By Virtual's own argument, however, the "Coronet" cover and page header indicate that Beaulieu owns all the images in the Coronet Catalog.

39.    Beaulieu stored the catalogs and CDs in a CD library that numbered in the thousands in Mr. Stern's office—just as Virtual delivered them. Stella Decl. ¶ 44, Exh. PP, Stern Tr. at 12:18–22, 13:22–24, 14:11–20; Stella Decl. ¶ 45, Exh. QQ, Jaynes Tr. at 13:2–14:18, 34:4–14.

20742497.1

**RESPONSE:** Virtual disputes Beaulieu's thirty-ninth statement of undisputed material facts. The evidence Beaulieu cites in support of this statement does not indicate that Virtual delivered CDs or catalogs to be stored in the fashion chosen by Mr. Stern. It was his choice, not Virtual's, to store around 1,000 discs containing room scenes in a manner such that a person retrieving a room scene disk "would have no way of knowing where [he] got [it] from."

**REPLY:** Virtual's response does not overcome the facts. Virtual does not dispute that Beaulieu stored the discs Virtual delivered just as Virtual delivered them – with no label identifying the images as property of Virtual, or any notice of a limited license. Beaulieu never argued that Virtual directed Mr. Stern to use a particular storage method, Mr. Stern's method of storage is thus immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.

Virtual ignores that it was Virtual's choice to deliver its CDs without any identifying information on the CD case, CD cover, or image files, and Virtual's choice to not include any copyright notice on the CD case, CD cover, or any of the images. It was for those reasons that neither Mr. Stern nor any other Beaulieu employee could know the origin of those room scene images.

40. Beaulieu received all Virtual invoices in hard copy by mail. Stella Decl. ¶ 48, Exh. TT, Beaulieu's Interrogatory Response in Response to Area of Inquiry 12 of Plaintiff's Notice of 30(b)(6) Deposition Duces Tecum ("Rog. Resp. A.I. 12"); Stella Decl. ¶ 46, Exh. RR, Clay Tr. at 43:20.

**RESPONSE:** Virtual disputes Beaulieu's fortieth statement of undisputed material facts. Virtual sent Beaulieu invoices by mail, email, and fax.

**REPLY:**  Virtual's response does not overcome the facts.  The deposition testimony of Mr. Sucher cited by Virtual does not support its assertion that Virtual sent its invoices to Beaulieu by email and fax, and SUMF No. 40 should thus be deemed as admitted.  Mr. Sucher's testimony relates only to a single invoice for additional fees he sought from Beaulieu for allegedly misused room scenes.  Mr. Sucher claims to have prepared that invoice in 2009, following his allegations of Beaulieu's room scene misuse.  Virtual has not produced any such invoice in this case.

41.      Whether they were addressed to the company, generally, or to an employee, specifically, as a rule, all invoices were routed to Accounts Payable ("A/P").  Stella Decl. ¶ 45, Exh. QQ, Jaynes Tr. at 37:6–18; Stella Decl. ¶ 44, Exh. PP, Stern at Tr. 44:1–20; Stella Decl. ¶ 48, Exh. TT, Rog. Resp. A.I. 12; Stella Decl. ¶ 28, Exh. Z, 12/06/05 Virtual Invoice (DX 32); Stella Decl. ¶ 29, Exh. AA, 4/07/08 Virtual Invoice (DX 33).

**RESPONSE:** Virtual does not dispute Beaulieu's forty-first statement of undisputed material facts, though it notes that the evidence cited by Beaulieu in support of this statement shows that the decision to "route" all of Virtual's invoices to "A/P" was Beaulieu's, not Virtual's.

**REPLY:**  Virtual's response does not overcome the facts.  Virtual does not dispute that all invoices to Beaulieu were routed to Accounts Payable.  It is immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions that this was Beaulieu's decision.

42.      The invoices, which Plaintiff asserts have included Virtual's preprinted "Terms and Conditions" on the back since the company's inception in 1996, were not reviewed by

employees outside A/P, nor were they ever signed by any Beaulieu employee.  Stella Decl. ¶ 45, Exh. QQ, Jaynes Tr. at 37:6–18; Stella Decl. ¶ 44, Exh. PP, Stern at Tr. 44:1–20; Stella Decl. ¶ 48, Exh. TT, Rog. Resp. A.I. 12; Exh. XX, 12/06/05 Virtual Invoice (DX 32); Exh. XX, 4/07/08 Virtual Invoice (DX 33); Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 17:9–21:23; Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 66:8–14.

**RESPONSE:** Virtual disputes Beaulieu's forty-second statement of undisputed material facts. Mr. Stern stated in his deposition that he may have reviewed Virtual's invoices during the early years of the parties' business relationship. Further, even without signing these invoices, Beaulieu paid nearly every one Virtual ever issued to it for room scene work.

<u>**REPLY:**</u>  Virtual's response does not overcome the facts.  Virtual does not dispute that its invoices were never signed by any Beaulieu employee.  Virtual cites the following from Mr. Stern's deposition testimony to imply that Mr. Stern was aware of Virtual's purported Terms & Conditions listed on the back of the invoices:  "In the beginning I might have looked at an invoice just to make sure it was what I was getting."  By Virtual's own admission, however, during the time when Mr. Stern may have looked at an invoice those Terms & Conditions did not apply to the invoiced work.  During the early stage of its relationship with Beaulieu, Virtual was digitizing room scene photos belonging to Beaulieu.  In the cited portion of the deposition transcript, Mr. Stern further testified that it was his practice when he received a Virtual invoice to write "Accounts Payable" on the outside of envelope and interoffice it to that department. [Citation?]

44.     Virtual amended its Terms and Conditions in 2003, but has since used the old and new versions interchangeably.  Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 17:9–21:23; Stella Decl.

¶ 4, Exh. B, Virtual's Terms and Conditions (1996) ("T&C 1996") (DX 4); Stella Decl. ¶ 20,

Exh. R, Virtual's Terms and Conditions (revised 2003) ("T&C 2003") (DX 23).

**RESPONSE:** Virtual does not dispute Beaulieu's forty-fourth statement of undisputed

material facts, though it states that the evidence cited by Beaulieu does not indicate the extent to

which this interchangeable use occurred.

<u>**REPLY:**</u> This fact is admitted. Virtual does not dispute that it has used its original and

amended versions of its T&C interchangeably since 2003. The extent to which this

interchangeable use occurred is immaterial and not relevant or essential to the resolution of the

issues presented in Beaulieu's summary judgment motions.

48.     Neither Mr. Sucher nor any other employee of Virtual has any recollection of

discussing the Terms and Conditions with anyone from Beaulieu. Stella Decl. ¶ 43, Exh. OO,

Sucher Tr. at 39:18–40:2; Stella Decl. ¶ 47, Exh. SS, Farmer Tr. at 50:1–51:9; Stella Decl. ¶ 46,

Exh. RR, Clay Tr. at 87:1–12.

**RESPONSE:** Virtual disputes Beaulieu's forty-eighth statement of undisputed material

facts. The parties began doing business with each other in 1997, and the invoices Virtual sent

Beaulieu with Virtual room scene images contained an explicit one-year term of use. Further,

Virtual discussed the one-year term of use of its images with Beaulieu as early as 2000.

<u>**REPLY:**</u> Virtual's response does not overcome the facts. This fact relates only to

recollection of conversations; whether the purported Terms & Conditions were listed on the back

of Virtual's invoices is immaterial to this fact. Indeed, Mr. Sucher, himself, testified at

deposition that *he has no recollection* of discussing Virtual's purported Terms and Conditions

with anyone at Beaulieu, including Mr. Stern or Mr. Ruble:

> Q: And at the time that you started working with Beaulieu back in 1996, as
> alleged --
> A: Seven.
> Q: -- or 1997, sorry, as alleged in the complaint, did you sit down with Mr. Stern
> or with Sam --
> A: Sam Ruble, that's his name.
> Q: Okay. Great -- Mr. Ruble, and review the terms and conditions found in
> Exhibit 4?
> A: **I'm not sure whether I did or not.**

(See SUMF ¶ 25; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.) Ms. Clay gave similar

testimony. See (Clay Tr. 87:1-12.) Moreover, it is clear from the portion of Mr. Sucher's

testimony cited by Virtual that Mr. Sucher does not recall any particular relevant discussion with

anyone from Beaulieu in 2000 or at any other time—he merely names people he believes could

have been involved in such a discussion. Virtual has not proven that any such discussion

actually took place.

49.     Neither Virtual nor Beaulieu ever presented a formal contract to the other party,

nor did they ever discuss Virtual's room scene purchase options or ownership of those room

scenes. Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2, 51:23–52:25; Stella Decl. ¶ 46,

Exh. RR, Clay Tr. at 87:1–12; Stella Decl. ¶ 44, Exh. PP, Stern Tr. at 38:20–25, 91:16–94:17;

Stella Decl. ¶ 45, Exh. QQ, Jaynes Tr. at 14:19–22, 34:18–35:5, 37:6–38:7, 42:11–43:1.

**RESPONSE:** Virtual disputes Beaulieu's forty-ninth statement of undisputed material

facts. The portions of Mr. Sucher's and Ms. Clay's depositions to which Beaulieu cites in support

of this statement do not contain testimony about whether Virtual discussed the room scene

purchase options with Beaulieu. And indeed, Virtual did discuss these options with multiple

Beaulieu employees around 1999 or 2000. Further, the written invoices Beaulieu received from

Virtual indicated that Beaulieu had only a temporary right to use Virtual's room scenes.

**REPLY:** Virtual's response does not overcome the facts. The response fails to dispute –

and therefore admits – that "Neither Virtual nor Beaulieu ever presented a formal contract to the

other party," listing the Terms and Conditions on the back of the invoice is immaterial to this

fact, especially when, by Virtual's own admission, during the first two years of the parties'

business relationship, the purported Terms & Conditions that were listed on the back of Virtual's

invoices *did not apply to the invoiced work: digitizing room scene photos that belonged to

Beaulieu*. Also by Virtual's admission, those Terms & Conditions did not explain Virtual's

purported three purchase options. Furthermore, Beaulieu has established that none of its

employees had any knowledge of the purported one-year license term. Indeed, Mr. Sucher,

himself, testified at deposition that *he has no recollection* of discussing Virtual's purported

Terms and Conditions with anyone at Beaulieu, including Mr. Stern or Mr. Ruble:

> Q: And at the time that you started working with Beaulieu back in 1996, as
> alleged --
> A: Seven.
> Q: -- or 1997, sorry, as alleged in the complaint, did you sit down with Mr. Stern
> or with Sam --
> A: Sam Ruble, that's his name.
> Q: Okay. Great -- Mr. Ruble, and review the terms and conditions found in
> Exhibit 4?
> A: **I'm not sure whether I did or not.**

(See SUMF ¶ 25; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.) Moreover, it is clear

from the portion of Mr. Sucher's testimony cited by Virtual that Mr. Sucher does not recall any

particular relevant discussion with anyone from Beaulieu in 2000 or at any other time—he

merely names people he believes could have been involved in such a discussion. Virtual has not

proven that any such discussion actually took place.

Additionally, it is telling that in the course of the parties' 15-year business relationship, Beaulieu *never* purchased any room scene under Option 1 or 2. That is because Beaulieu had no knowledge that such options existed.

50.    Plaintiff alleges that the Terms and Conditions governed "all work between Virtual and Beaulieu." Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 82:10–14.

**RESPONSE:** Virtual disputes Beaulieu's fiftieth statement of undisputed material facts. Virtual did not "allege" that each of the Terms and Conditions on its invoices "governed 'all work between'" the parties. For example, the one year term of use did not control when Virtual was manipulating an image already owned by Beaulieu.

<u>**REPLY:**</u>  Beaulieu agrees that "the one year term of use did not control when Virtual was manipulating an image already owned by Beaulieu." The Terms and Conditions included on the back of invoices are silent on manipulation of room scenes to which Beaulieu had "unlimited use;" therefore, those Terms and Conditions did not prohibit such manipulation.

53.    Mr. Sucher does not recall ever having discussed those options with anyone from Beaulieu. Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.

**RESPONSE:** Virtual disputes Beaulieu's fifty-third statement of undisputed material facts. In the portion of Mr. Sucher's deposition transcript to which Beaulieu refers, Mr. Sucher discusses only the Terms and Conditions in Virtual's invoices:

```
18          Q    Okay.  And at the time that you started
19   working with Beaulieu back in 1996, as alleged --
20          A    Seven.
21          Q    -- or 1997, sorry, as alleged in the
22   complaint, did you sit down with Mr. Stern or with
23   Sam --
24          A    Sam Ruble, that's his name.
25          Q    Okay.  Great -- Mr. Ruble, and review the
```

```
1    terms and conditions found in Exhibit 4?
2           A    I'm not sure whether I did or not.          29
```

So Mr. Sucher did not discuss and was not questioned about Virtual's three purchase options in this portion of his deposition.  Further, Mr. Sucher stated in his affidavit that he did in fact discuss these purchase options with employees of Beaulieu well before the parties engaged in the current dispute.

**REPLY:**  Virtual's response does not overcome the facts.  As discussed above, by Virtual's own admission, the purported Terms & Conditions listed on the back of Virtual's invoices do not explain Virtual's purchase options, and only apply to one of those options. Beaulieu has established that none of its employees had any knowledge of those options or the purported one-year license term.  Indeed, Mr. Sucher, himself, testified at deposition that *he has no recollection* of discussing Virtual's purported Terms and Conditions, which Virtual alleges govern Beaulieu's purchases of Option 3, with anyone at Beaulieu, including Mr. Stern or Mr. Ruble:

> Q:  And at the time that you started working with Beaulieu back in 1996, as alleged --
> A:  Seven.
> Q:  -- or 1997, sorry, as alleged in the complaint, did you sit down with Mr. Stern or with Sam --
> A:  Sam Ruble, that's his name.
> Q:  Okay. Great -- Mr. Ruble, and review the terms and conditions found in Exhibit 4?

20742497.1

A: **<u>I'm not sure whether I did or not.</u>**

(See SUMF ¶ 25; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.)  Moreover, it is clear from the portion of Mr. Sucher's affidavit cited by Virtual that Mr. Sucher does not recall any particular relevant discussion with anyone from Beaulieu in 2000 or at any other time—he merely names people he believes could have been involved in such a discussion.  Virtual has not proven such discussions actually took place.  Beaulieu will be moving to strike this sham affidavit, which attempts to create a genuine dispute of material fact by contradicting the deposition testimony.

Additionally, it is telling that in the course of the parties' 15-year business relationship, Beaulieu *never* purchased any room scene under Option 1 or 2.  That is because Beaulieu had no knowledge that such options existed.

54.     Beaulieu has never identified an "Option 3" or a one-year non-exclusive license option in a purchase order to Virtual, nor has Virtual ever invoiced Beaulieu for that option. Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 22:22–24:20, 30:18–25; Stella Decl. ¶ 46, Exh. RR, Clay Tr. at 110:22–111:3.

**RESPONSE:** Regarding Beaulieu's fifty-fourth statement of undisputed material facts, Virtual does not dispute the absence of language in Beaulieu's purchases orders related to its license option or one-year license. Virtual also does not dispute that its invoices contained no specific reference to Beaulieu's license option. However, the terms of Option 3 are such that Beaulieu never owed, and was therefore would not be billed for any separate license fee. Rather, customers like Beaulieu that chose Option 3 were billed only for Virtual's manipulations to room scene images.

**REPLY:**  This fact is admitted.  Virtual does not dispute that Beaulieu never identified an "Option 3" or a one-year non-exclusive license option in a purchase order to Virtual, nor that Virtual never invoiced Beaulieu for that option.  Whether Beaulieu would have been "billed for any separate license fee" is immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.

59.    "Unlimited use" entitles licensees to those uses enumerated by section 106 of the Copyright Act, including the right to reproduce, prepare derivative works based upon, distribute copies of, or publicly display the copyrighted work.  17 U.S.C. § 106.

**RESPONSE:** Before responding to Beaulieu's fifty-ninth statement of undisputed material fact, Virtual objects to the extent that this "statement of fact" is a legal conclusion apparently based upon Beaulieu's interpretation of a federal statute. Legal conclusions are not "facts" of the sort contemplated by Fed. R. Civ. P. Rule 56, and therefore statements like this do not warrant responses.

But even if this "statement of fact" did warrant a response, Virtual would dispute it. 17 U.S.C. § 106 is a statute that lists the rights that accompany ownership of a copyrighted work. It does not contemplate the rights of limited licensees, nor does it contain the phrase "unlimited use."

**REPLY:**  This fact is admitted.  Virtual's purported T&C grants "unlimited use" of its room scene images under purchase Option 3.  Virtual argues that the only limitation on such "unlimited use" is the one-year term based on paragraph 1 of the T&C.  Virtual's response fails to define "unlimited use," or whether such use includes the right to perform those activities listed

34

in § 106, i.e., to "reproduce, prepare derivative works based upon, distribute copies of, or publicly display the copyrighted work." SUMF No. 59 should thus be deemed admitted.

60. Mr. Sucher was fully informed of the manner in which Beaulieu used room scenes, testifying that Virtual's purported license permits licensees to "use it for a rack card or a deck board or whatever you want to use it for in your advertising." Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 37:4–7.

**RESPONSE:** Virtual disputes Beaulieu's sixtieth statement of undisputed material facts as it is stated. Upon being asked about his understanding of some of his customers' duties under Option 3, Mr. Sucher stated that they could "use [a room scene] for a rack card or a deck board or whatever [they] want[ed] to use it for in [their] advertising," but that "[a]fter the one year, they have to stop using the photograph." He also noted moments earlier that customers that chose Option 3 could not "manipulate the room in any way, shape, or form."

**<u>REPLY</u>:** This fact is admitted. Virtual does not dispute that Mr. Sucher was fully informed of the manner in which Beaulieu used room scenes. The additional statements from Mr. Sucher's deposition testimony quoted by Virtual are immaterial to Mr. Sucher's knowledge of such use.

61. Virtual claims that its clients are prohibited from manipulating any Virtual room scene photograph, specifically, according to Mr. Sucher, by the terms of paragraph 4, which states that a "[c]lient may not assign or transfer this agreement, or any rights granted hereunder." Stella Decl. ¶ 43, Exh. OO, Sucher Tr. 26:1–10; Stella Decl. ¶ 3, Exh. A, Complaint ¶¶ 1, 4; Stella Decl. ¶ 4, Exh. B, T&C 1996 (DX 4); Stella Decl. ¶ 20, Exh. R, T&C 2003 (DX 23).

**RESPONSE:** Virtual does not dispute Beaulieu's fifty-eighth statement of undisputed material facts insofar as it characterizes one portion of Mr. Sucher's testimony. However, Beaulieu [sic, Virtual] disputes this statement to the extent that it implies that paragraph 4 in Virtual's Terms and Conditions was the only source of the prohibition on manipulation. Customers that chose either Option 2 or Option 3 were prohibited from manipulating Virtual's room scenes.

**REPLY:** This fact is admitted. Virtual concedes that its purported Terms & Conditions neither expressly nor impliedly include a prohibition against manipulation of its images, but argues that "Virtual interpreted the paragraph in question [¶ 4 of the T&C] so as to include a prohibition on manipulation." Virtual's misunderstanding and misinterpretation of its own T&C does not change the fact that nothing in those T&C imposed such a restriction on its customers' use of its room scene images. Without citing any support or proof, Virtual responds, "Beaulieu [sic, Virtual] disputes this statement to the extent that it implies that paragraph 4 in Virtual's Terms and Conditions was the only source of the prohibition on manipulation." Virtual, however, fails to name any other source of the alleged prohibition on room scene manipulation.

62. The language of paragraph 4 does not mention any prohibition on photo manipulations. Stella Decl. ¶ 4, Exh. B, T&C 1996 (DX 4); Stella Decl. ¶ 20, Exh. R, T&C 2003 (DX 23).

**RESPONSE:** Regarding Beaulieu's sixty-second statement of undisputed material facts, Virtual does not dispute the absence of an explicit prohibition on manipulations in the paragraph referenced by Beaulieu. But, pursuant to Mr. Sucher's deposition testimony, Virtual interpreted the paragraph in question so as to include a prohibition on manipulation.

**REPLY:**  This fact is admitted.  Virtual concedes that its purported Terms & Conditions neither expressly nor impliedly include a prohibition against manipulation of its images, but argues that "Virtual interpreted the paragraph in question [¶ 4 of the T&C] so as to include a prohibition on manipulation."  Virtual's misunderstanding and misinterpretation of its own T&C does not change the fact that nothing in those T&C imposed such a restriction on its customers' use of its room scene images.

63.    Photo manipulation is a derivative work expressly permitted by the "unlimited use" provision, as one of the section 106 exclusive rights of the copyright holder.  17 U.S.C. § 106.

**RESPONSE:** Before responding to Beaulieu's fifty-ninth statement of undisputed material fact, Virtual objects to the extent that this "statement of fact" is a legal conclusion apparently based upon Beaulieu's interpretation of a federal statute. Legal conclusions are not "facts" of the sort contemplated by Fed. R. Civ. P. Rule 56, and therefore statements like this do not warrant responses.

But even if this "statement of fact" did warrant a response, Virtual would dispute it. 17 U.S.C. § 106 is a statute that lists the rights that accompany ownership of a copyrighted work. It does not contemplate the rights of limited licensees, nor does it contain the phrase "unlimited use." All portions of § 106, including that permitting the creation of derivative works, relate to the "owner" of a copyright. As evidenced by the temporal restriction and bar against transfer in the Terms and Conditions, and the prohibition against manipulation under Option 3, Beaulieu in no way "owned" the copyrighted room scenes it obtained from Virtual.

**REPLY:** This fact is admitted. Virtual's purported T&C grants "unlimited use" of its room scene images under purchase Option 3. Virtual argues that the only limitation on such "unlimited use" imposed by the T&C is the one-year term set forth in paragraph 1. Virtual concedes that its T&C neither expressly nor impliedly include a prohibition against manipulation of its images, but argues that "Virtual interpreted the paragraph in question [¶ 4 of the T&C] so as to include a prohibition on manipulation." Virtual's misunderstanding and misinterpretation of its own T&C does not change the fact that nothing in those T&C imposed such a restriction on its customers' use of its room scene images. Virtual now states without support or proof that there was nevertheless a "prohibition against manipulation under Option 3."

Virtual's response furthermore fails to define "unlimited use," or whether such use includes the right to perform any of those activities listed in § 106, including preparing derivative works. Since Virtual has cited no document or other proof that there was any prohibition on room scene manipulation, SUMF No. 59 should be deemed admitted.

67.     Plaintiff admits it knew of Beaulieu's alleged infringement of room scene images as early as 2007, and its emails indicate that Virtual had such knowledge as early as 2004. Stella Decl. ¶ 19, Exh. Q, 8/08 email chain (DX 22), at B0000001–02; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 166:16–169:3.

**RESPONSE:** Virtual disputes Beaulieu's sixty-seventh statement of undisputed material facts. During his deposition, Mr. Sucher clarified statements about in the emails to which Beaulieu refers. He indicated that he may have first observed Beaulieu's wrongful use of his room scenes as early as 2007, not 2004.

**REPLY:** This fact is admitted. Virtual does not dispute that Mr. Sucher testified that he may have first observed Beaulieu's alleged room scene misuse in 2007. Virtual does not dispute at all the fact the Virtual's "emails indicate that Virtual had such knowledge as early as 2004."

70. Virtual also produced photos of carpet displays that Virtual contends contain infringing uses of Virtual's room scene images. Mr. Sucher testified he has no evidence of the date(s) on which the accused room scene images from in-store displays were printed. Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 204:11–16.

**RESPONSE:** Regarding Beaulieu's seventieth statement of undisputed material facts, Virtual does not dispute that Mr. Sucher did not "know the exact dates" that the in-store displays were printed. However, Virtual disputes Beaulieu's seventieth statement to the extent that implies there is "no evidence" of such displays' age. Immediately after stating that he did not know exact printing dates for these displays, Mr. Sucher testified that he knew of "new displays at Home Depot and Lowe's"-his deposition occurred on November 13, 2012-that contained room scenes Virtual provided to Beaulieu.

**REPLY:** The fact is admitted. Virtual does not dispute that Mr. Sucher has no evidence of the date(s) on which the accused room scene images from in-store displays were printed. His vague statement that some displays he saw were "new" does not prove when any images on them actually were printed. This fact, therefore, should be deemed admitted.

73. Mr. Sucher alleged that Beaulieu had used several of Virtual's images for more than one year, and digitally manipulated those images, in violation of Virtual's terms and conditions. Stella Decl. ¶ 19, Exh. Q, 8/08 Sucher-Stern email chain at (DX 22).

**RESPONSE:** Virtual does not dispute Beaulieu's seventy-third statement of undisputed material facts insofar as it notes Mr. Sucher's email complaint to Mr. Stern in 2008. But Virtual does dispute this statement to the extent that it implies that the Terms and Conditions of Virtual's invoices were the only conditions governing the parties' business relationship.

**REPLY:**  This fact is admitted.  Virtual does not dispute that Mr. Sucher alleged in a 2008 email that Beaulieu had misused Virtual's images.  Virtual "dispute[s] this statement to the extent that it implies that the Terms and Conditions of Virtual's invoices were the only conditions governing the parties' business relationship."  The portions of Mr. Sucher's affidavit cited by Virtual, however, do not support its implication that Virtual imposed restrictions on use of its room scenes beyond those set forth in its Terms and Conditions (and Beaulieu does not concede that the T&C governed the parties' business relationship).  Furthermore, Beaulieu will be moving to strike this sham affidavit, which attempts to create a genuine dispute of material fact by contradicting the deposition testimony.  Mr. Sucher testified at deposition that *he has no recollection* of discussing Virtual's purported Terms and Conditions with Mr. Stern or Mr. Ruble:

> Q:  And at the time that you started working with Beaulieu back in 1996, as alleged --
> A:  Seven.
> Q:  -- or 1997, sorry, as alleged in the complaint, did you sit down with Mr. Stern or with Sam --
> A:  Sam Ruble, that's his name.
> Q:  Okay. Great -- Mr. Ruble, and review the terms and conditions found in Exhibit 4?
> A:  **I'm not sure whether I did or not.**

(See SUMF ¶ 25; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 39:18–40:2.)  Moreover, it is clear from the portion of Mr. Sucher's testimony cited by Virtual in its responses to SUMFs 25 and 26

that Mr. Sucher does not recall any particular relevant discussion with anyone from Beaulieu in 2000 or at any other time—he merely names people he believes could have been involved in such a discussion. Mr. Sucher's spontaneous recollection of conversations he claims in his affidavit to have had 13 or 14 years ago is thus unreliable and does not prove that any such conversations actually took place.

74. Beaulieu's former Senior Vice President of Marketing, Patricia Flavin, negotiated with Tom Sucher over the next five or six months to resolve the dispute, conferring by phone, in-person, and through the exchange of numerous emails. Stella Decl. ¶ 22, Exh. T, December 2008–March 2009 Sucher-Flavin email chain (DX 25); Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 37:9–14, 61:22–65:4, 67:20–72:17, 74:8–79:1, 80:7–81:10, 82:16–83:12; Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 197:13–199:25, 201:1–203:6, 209:18–210:21, 211:6–230:15, 233:23–238:13. Stella Decl. ¶ 21, Exh. S, December 2008-March 2009 Stern-Dempsey-Tijan email chain (DX 24).

**RESPONSE:** Regarding Beaulieu's seventy-fourth statement of undisputed material facts, Virtual does not dispute that Mr. Sucher contacted Ms. Flavin in an attempt to resolve the dispute about Beaulieu's use of Virtual's room scenes by collecting payment from Beaulieu. Virtual also does not dispute that the two conducted some of these discussions via email and during two face-to-face meetings.

**REPLY:** Virtual either does not dispute any portion of SUMF No. 74 and it should thus be deemed admitted.

20742497.1

77.     Mr. Sucher and Ms. Flavin finally settled the parties' dispute during their second in-person meeting in early 2009 ("2009 Settlement").  Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 37:9–14, 74:8–81:10.

**RESPONSE:** Virtual disputes Beaulieu's seventy-seventh statement of undisputed material facts. This statement of fact is based solely upon the testimony of one person, Patricia Flavin, an ex-Beaulieu employee. But even if Ms. Flavin was somehow in a position to authoritatively state that both parties do not dispute something, her testimony in question does not support the proposition that the parties "settled" their dispute.

Rather, Ms. Flavin testified only that, after a series of discussions with Mr. Sucher, she formed a number of "assumptions" and "understandings" about the parties' desire to "move forward."  "[I]t was [her] understanding" that the parties' "business relationship was moving ahead," she "believed" they reached a "resolution to move forward," she "guess[ed]" that she "assumed" that "some" of Virtual's photos "were okay to be used" after their negotiations, and she "assumed" Mr. Sucher "was comfortable with the ongoing business relationship" between the parties.

Nowhere in these portions of Ms. Flavin's testimony did she detail any written, concrete, or specific terms of any alleged "settlement" between the parties. In fact, a number of times she stated that she did not "recall" all the details of the final meeting she had with Mr. Sucher, and that she did not recall what she understood "was going to happen" next. Though she noted that Mr. Sucher made a number of demands in lengthy emails, she testified only that her last meeting with him "was probably to come to a more realistic number" and "an expectation of a business relationship going forward .... "At best, it was Ms. Flavin's "understanding that [they] were

20742497.1

working towards a goal to continue a business relationship." When asked whether she had been given the authority to pay any specific amount to settle Virtual's claims, Ms. Flavin responded simply and unequivocally: "No."

Further, Mr. Sucher stated in at least one portion of his deposition that what potential non-monetary offers the parties did discuss were not "going to resolve the dispute."" Likewise, when asked specifically whether he "believed that [Virtual] had a deal with Beaulieu to address the room scene images problems that you brought to Beaulieu's attention in 2008," Mr. Sucher replied, "No."

**REPLY:**  Virtual's response does not overcome the facts.  In paraphrasing Ms. Flavin's deposition testimony, Virtual ignores that Ms. Flavin testified that, following negotiations with Mr. Sucher, "**I had an understanding and agreement**" with Virtual "to use images, room scenes, and help develop a business relationship with Beaulieu."  Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 44:22–25.  Virtual complains that Ms. Flavin did not "detail any written, concrete, or specific terms" of the settlement between the parties.  The terms of the settlement, however, were simple:  Beaulieu received Virtual's promise that its claims were resolved and would not be litigated, in exchange for Beaulieu's promise that it would continue to give Virtual room scene business, and that it would consider using Virtual's services beyond room scene work.  (Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 36:1–19, 37:9–14, 44:22–25, 74:8–81:10.)   As Ms. Flavin testified:

> Q.  Or asked another way, did you intend to do business -- did Beaulieu intend to do business with Virtual Studios if it left Beaulieu open to being sued for copyright infringement?
> A.  It never got to that point.

(Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 83:2–7.)

It is evident from Mr. Sucher's testimony that the parties did, indeed, reach an agreement, and that Virtual initiated the instant suit due to its belief that Beaulieu did not perform on that agreement:

A. [Ms. Flavin]said that we would get all Beaulieu room scenes.
Q. And Patricia said that the company would do that for you, right?
A. Yes.
Q. And now your claim is that Beaulieu didn't perform on that, that Beaulieu failed to do that?
A. That's correct.
Q. All right.
A. I did not get all Beaulieu room scenes.

(Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at Sucher Tr. at 238:9–18.)

Contrary to Virtual's assertion, Ms. Flavin did not need to be "given the authority to pay any specific amount to settle Virtual's claims" because, as Senior Vice President of Marketing, she already had such authority. This is evident from the several email offers from Ms. Flavin to Virtual of cash payments ranging from $8,000 to $18,000, as well as her deposition testimony (see SUMF ¶ 76; Stella Decl. ¶ 22, Exh. T, December 2008–March 2009 Sucher-Flavin email chain (DX 25); Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 82:16–83:12):

Q. (By Mr. Anderson) Did you ever conclude on your own what amount of money would  be the most that you would propose offering to Virtual Studios to resolve these claims?
A. Yes.
Q. What was that?
A. Off the top of my head, it was certainly under 10,000.
Q. How did you arrive at that figure?
A. Tom, I believe, had suggested 18 at some point.  So we were coming down in the right direction.  And I believe I came back with an 8, 9 figure.  I can't recall the exact.
Q. Did someone give you direction to negotiate the best deal you could with Mr. Sucher?
A. No.
Q. Did Mr. Meadows tell you to negotiate the best deal you could with him?
A. I don't recall.

Q. Did Mr. Boe?

A. No.

Virtual points to Mr. Sucher's testimony denying that Virtual reached an agreement with Beaulieu. That testimony, however, is a *post-hac* invention, contradicted not only by Ms. Flavin's testimony, but also by Mr. Sucher's contemporaneous actions: Mr. Sucher's emails stopped, Mr. Sucher's requests for additional payment stopped, business between the parties continued and Beaulieu received no further complaints from Mr. Sucher until he filed suit years later. (Stella Decl. ¶ 25, Exh. W, June-July 2009 Sucher-Flavin email chain (DX 28); Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 36:1–19; Stella Decl. ¶ 3, Exh. A, Complaint (DX 3).)

78.    During that meeting, Ms. Flavin explained to Mr. Sucher that his expectations regarding the requested level of Beaulieu's room scene business were unrealistic in light of the housing market crash. Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 72:9–17, 76:12–77:1.

**RESPONSE:** Regarding Beaulieu's seventy-eighth statement of undisputed material facts, Virtual does not dispute that Ms. Flavin testified that she felt Mr. Sucher's expectation of payment was "too high." But Virtual does dispute that Ms. Flavin said that this was due to "the housing market crash." In the portion of the deposition transcript to which Beaulieu cites, Ms. Flavin stated only that the "market face" in the "industry" had "changed" since 2006.

**<u>REPLY:</u>** This fact is admitted. Virtual does not dispute that Ms. Flavin explained to Mr. Sucher that his expectations regarding the requested level of Beaulieu's room scene business were unrealistic in light of the industry changes since 2006. Ms. Flavin explained the housing market crash as the cause of those 2006 changes earlier in her deposition:

> Q. What were the trends with regard to sales of carpet products from the time you started until you left? Did they stay level? Increase? Decrease?
>
> A. Decreased dramatically.
>
> Q. Tell me what you mean.
>
> A. The housing bubble happened in 2006, 2007. And we all are aware of that. The company's overall sales and I'm assuming every other carpet manufacturer's sales of homes went down to pre-1982 home sales, and carpet went down accordingly.
>
> Q. Do you remember in terms of a percentage what the sales revenue decline was or the most significant decline you saw?
>
> A. I don't recall, but it was significant.
>
> Q. Was it as much as 50 percent?
>
> A. It could have been.
>
> Q. But you don't recall specifically?
>
> A. Uh-uh.
>
> Q. You need to say yes or no.
>
> A. Oh, yes. I'm sorry, I don't.

Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 51:23–52:20. Furthermore, the 2006 housing market crash was not only industry but worldwide knowledge. Virtual's dispute that Ms. Flavin did not expressly use the term "housing" in the latter portion of her deposition testimony is thus immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.

80. That meeting concluded with Beaulieu's receipt of Virtual's promise that its claims were resolved and would not be litigated, in exchange for Beaulieu's promise that it would continue to give Virtual room scene business, and that it would consider using Virtual's services beyond room scene work. Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 36:1–19, 37:9–14, 44:22–25, 80:7–81:10.

**RESPONSE:** Virtual disputes Beaulieu's eightieth statement of undisputed material facts. See Virtual's response to Beaulieu's seventy-seventh statement.

**REPLY:** This fact is admitted. In paraphrasing Ms. Flavin's deposition testimony,

Virtual ignores that Ms. Flavin testified that, following negotiations with Mr. Sucher, "**I had an**

**understanding and agreement**" with Virtual "to use images, room scenes, and help develop a

business relationship with Beaulieu." Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 44:22–25.

Virtual complains that Ms. Flavin did not "detail any written, concrete, or specific terms" of the

settlement between the parties. The terms of the settlement, however, were simple: Beaulieu

received Virtual's promise that its claims were resolved and would not be litigated, in exchange

for Beaulieu's promise that it would continue to give Virtual room scene business, and that it

would consider using Virtual's services beyond room scene work. (Stella Decl. ¶ 42, Exh. NN,

Flavin Tr. at 36:1–19, 37:9–14, 44:22–25, 74:8–81:10.) As Ms. Flavin testified:

> Q. Or asked another way, did you intend to do business -- did Beaulieu intend to
> do business with Virtual Studios if it left Beaulieu open to being sued for
> copyright infringement?
> A. It never got to that point.

(Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 83:2–7.)

It is evident from Mr. Sucher's testimony that the parties did, indeed, reach an agreement,

and that Virtual initiated the instant suit due to its belief that Beaulieu did not perform on that

agreement:

> A. [Ms. Flavin]said that we would get all Beaulieu room scenes.
> Q. And Patricia said that the company would do that for you, right?
> A. Yes.
> Q. And now your claim is that Beaulieu didn't perform on that, that Beaulieu
> failed to do that?
> A. That's correct.
> Q. All right.
> A. I did not get all Beaulieu room scenes.

(Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at Sucher Tr. at 238:9–18.)

Contrary to Virtual's assertion, Ms. Flavin did not need to be "given the authority to pay any specific amount to settle Virtual's claims" because, as Senior Vice President of Marketing, she already had such authority. This is evident from the several email offers from Ms. Flavin to Virtual of cash payments ranging from $8,000 to $18,000, as well as her deposition testimony (see SUMF ¶ 76; Stella Decl. ¶ 22, Exh. T, December 2008–March 2009 Sucher-Flavin email chain (DX 25); Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 82:16–83:12):

> Q. (By Mr. Anderson) Did you ever conclude on your own what amount of money would be the most that you would propose offering to Virtual Studios to resolve these claims?
> A. Yes.
> Q. What was that?
> A. Off the top of my head, it was certainly under 10,000.
> Q. How did you arrive at that figure?
> A. Tom, I believe, had suggested 18 at some point. So we were coming down in the right direction. And I believe I came back with an 8, 9 figure. I can't recall the exact.
> Q. Did someone give you direction to negotiate the best deal you could with Mr. Sucher?
> A. No.
> Q. Did Mr. Meadows tell you to negotiate the best deal you could with him?
> A. I don't recall.
> Q. Did Mr. Boe?
> A. No.

Virtual points to Mr. Sucher's testimony denying that Virtual reached an agreement with Beaulieu. That testimony, however, is a *post-hac* invention, contradicted not only by Ms. Flavin's testimony, but also by Mr. Sucher's contemporaneous actions: Mr. Sucher's emails stopped, Mr. Sucher's requests for additional payment stopped, business between the parties continued and Beaulieu received no further complaints from Mr. Sucher until he filed suit years later. (Stella Decl. ¶ 25, Exh. W, June-July 2009 Sucher-Flavin email chain (DX 28); Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 36:1–19; Stella Decl. ¶ 3, Exh. A, Complaint (DX 3).)

48

81.     Virtual failed to answer Beaulieu's counterclaim for over a year.  *See* D.I. 41, Request for Entry of Default; D.I. 44, Beaulieu's Reply in Support of Its Request for Entry of Default.

**RESPONSE:** Regarding Beaulieu's eighty-first statement of undisputed material fact, Virtual does not dispute that it filed an Answer responsive to Beaulieu's counterclaim in 2013. Virtual does dispute this statement to the extent that it implies Virtual waived any defenses it may have to Beaulieu's counterclaim or that it failed to otherwise defend itself. Virtual incorporates by reference the brief it filed in response to Beaulieu's "Application for Default," but also states that, in addition to its Answer, it has disputed and defended against Beaulieu's counterclaim a number of ways:

(1) It indicated in the Rule 26(f) report filed with the Court in March of 2012 that it "denie[d] that Beaulieu [was] entitled to recovery on its counterclaim," "denie[d] that Virtual [was] liable to Beaulieu for any compensatory consequential or other damages," and "denie[d] it breached any agreement with Beaulieu,"

(2) It served written discovery upon Beaulieu in 2012 that sought documents and information related to or supported Beaulieu's counterclaim;

(3) It questioned multiple deponents about the allegations m Beaulieu's counterclaim; and

(4) It asserted its disagreement with Beaulieu about the allegations of the counterclaim through Mr. Sucher's deposition testimony.

**<u>REPLY:</u>** This fact is admitted.  Virtual does not dispute that it failed to answer Beaulieu's counterclaim for over a year, and Beaulieu's Request for Entry of Default is pending

before this Court.  Virtual's arguments regarding its failure to answer Beaulieu's Counterclaim are immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.

82.     Beaulieu purchased room scene images from Virtual into 2011.  Stella Decl. ¶ 55, Exh. AAA, List of Virtual's 1999–2009 invoices to Beaulieu; Stella Decl. ¶ 56, Exh. BBB, List of Virtual's 2009–2011 invoices to Beaulieu.

**RESPONSE:** Virtual disputes Beaulieu's eighty-second statement of undisputed material facts. Though Virtual and Beaulieu conducted a small amount of business with one another between 2009 and 2011, Beaulieu did not obtain or "purchase" any of Virtual's room scene images. Rather, it had Virtual manipulate images Beaulieu owned.

<u>**REPLY:**</u>  Virtual does not dispute that Beaulieu purchased room scene manipulation work from Virtual as late as 2011.  The particular type of work is immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.

83.     Beaulieu continued to purchase room scene work from Virtual well into 2011. Stella Decl. ¶ 26, Exh. X, August 2009 Clay-Stern-Sucher email chain (DX 29); Stella Decl. ¶ 27, Exh. Y, December 16, 2010 Flavin-Stern email chain (DX 30); Stella Decl. ¶ 33, Exh. EE, September 9, 2010 Farmer-Bakker/Floyd email (DX 40); Stella Decl. ¶ 34, Exh. FF, September 2010 Floyd-Thompson/Farmer-Clay email chain (DX 41); Stella Decl. ¶ 35, Exh. GG, December 17, 2010 Farmer-Stern/Floyd email (DX 42); Stella Decl. ¶ 3, Exh. A, Complaint ¶ 12 (DX 3).

**RESPONSE:** Virtual disputes Beaulieu's eighty-third statement of undisputed material facts as it is stated. See response to Beaulieu's eighty-second statement of undisputed material facts.

**<u>REPLY:</u>** This fact is admitted. Virtual does not dispute that Beaulieu purchased room scene manipulation work from Virtual as late as 2011. The particular type of work is immaterial and not relevant or essential to the resolution of the issues presented in Beaulieu's summary judgment motions.

85.  In the months following, Mr. Sucher contacted Ms. Flavin to express his concern over the amount of room scene work Virtual received from Beaulieu. Stella Decl. ¶ 25, Exh. W, June-July 2009 Sucher-Flavin email chain (DX 28).

**RESPONSE:** Virtual disputes Beaulieu's eighty-fifth statement of undisputed material facts as it is stated. As part of their ongoing attempt to resolve the parties' dispute, Ms. Flavin at one point offered to give Virtual "all of Beaulieu's room scene work." After receiving very little room scene work from Beaulieu over the intervening months, Mr. Sucher contacted Ms. Flavin to inquire about Beaulieu's intentions and lament their inability to resolve the parties' dispute:

> Virtual Studios has only produced two or maybe three room scenes at most since this conversation ... started last year in August. As you also know I've tried to be very creative to try to resolve this but still nothing from Beaulieu . . . . Please get back to me this week on Beaulieu's plan to resolve this situation. If I don't hear from you at that time then I'm sorry but I must take this to our lawyer ....

**<u>REPLY:</u>** This fact is admitted. Virtual does not dispute that Mr. Sucher contacted Ms. Flavin to express his concern over the amount of room scene work Virtual received from Beaulieu. Virtual, however, mischaracterizes Mr. Sucher's email as "lament[ing] their inability to resolve the parties' dispute." As discussed above in Beaulieu's Reply to Response to SUMF

¶¶ 77 and 80, the parties had, indeed, reached an agreement that resolved their dispute. Mr.

Sucher's email asking for Beaulieu's plan to "resolve the situation" laments the "situation" that

Beaulieu is not sending Virtual enough work in satisfaction of that agreement, as Mr. Sucher

similarly lamented at his deposition:

> A. [Ms. Flavin]said that we would get all Beaulieu room scenes.
> Q. And Patricia said that the company would do that for you, right?
> A. Yes.
> Q. And now your claim is that Beaulieu didn't perform on that, that Beaulieu
>    failed to do that?
> A. That's correct.
> Q. All right.
> A. I did not get all Beaulieu room scenes.

(Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at Sucher Tr. at 238:9–18.) In response to Mr. Sucher's

email, Ms. Flavin explained:

> The marketing and Research and Development departments have both been
> instructed to give you all their room scene work going forward. The fact that it is
> minimum is sign of the times but [i]t will pick up,

and forwarded the email chain to those departments with instructions to "[p]lease confirm that all

your room scene work is going to Tom Sucher as requested." (Stella Decl. ¶ 25, Exh. W, June-

July 2009 Sucher-Flavin email chain (DX 28).)

Following Ms. Flavin's reply, Mr. Sucher's emails stopped, Mr. Sucher's requests for

additional payment stopped, business between the parties continued and Beaulieu received no

further complaints from Mr. Sucher until he filed suit years later. (Stella Decl. ¶ 25, Exh. W,

June-July 2009 Sucher-Flavin email chain (DX 28); Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at

36:1–19; Stella Decl. ¶ 3, Exh. A, Complaint (DX 3).)

86. Following Ms. Flavin's reassurance that more work could be expected later in the

year, closer to the flooring industry's annual conference, and confirmation that Mr. Sucher would

not pursue any legal claim, Mr. Sucher's emails stopped.  Beaulieu received no further

complaints from Mr. Sucher, until he filed suit years later.  Stella Decl. ¶ 25, Exh. W, June-July

2009 Sucher-Flavin email chain (DX 28); Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 36:1–19;

Stella Decl. ¶ 3, Exh. A, Complaint (DX 3).

**RESPONSE:** Virtual disputes Beaulieu's eighty-sixth statement of undisputed material

facts. The emails and deposition testimony cited here by Beaulieu do not contain any statements

to the effect that Mr. Sucher "confirmed" that Virtual "would not pursue any legal claims ...."

But even more telling of the inaccuracy of this "fact" is an email Ms. Flavin sent Mr. Sucher

only hours after the ones Beaulieu cites:

> From: Patricia Flavin
> To: 'tom@virtualstudios inc.com'
> Sent: Thu Jul 02 14:02:09 2009
> Subject: Re: Update
>
> Tom
> There are some room scenes on the way to you within the next two weeks. However, if
> we are to continue to help in deveoping this relationship, I will need you to sign a
> release to drop your grievances with the company
>
> I will have something drafted up next week and sent over to you.
> Patricia
>
> 58

So within a few days of receiving an email from Mr. Sucher in which he confirmed that the

parties had not yet reached a resolution and threatened legal action, Ms. Flavin asked Mr. Sucher

to "drop" his "grievances" by signing a release. Mr. Sucher, of course, never affirmatively

responded to Ms. Flavin's email, nor did he ever sign any release.

**REPLY:**  This fact is admitted.  Virtual does not dispute that Mr. Sucher contacted Ms.

Flavin to express his concern over the amount of room scene work Virtual received from

Beaulieu.  Virtual, however, mischaracterizes Mr. Sucher's email as "lament[ing] their inability

to resolve the parties' dispute."  As discussed above in Beaulieu's Reply to Response to SUMF

¶¶ 77 and 80, the parties had, indeed, reached an agreement that resolved their dispute. Mr.

Sucher's email asking for Beaulieu's plan to "resolve the situation" laments the "situation" that

Beaulieu is not sending Virtual enough work in satisfaction of that agreement, as Mr. Sucher

similarly lamented at his deposition:

> A. [Ms. Flavin]said that we would get all Beaulieu room scenes.
> Q. And Patricia said that the company would do that for you, right?
> A. Yes.
> Q. And now your claim is that Beaulieu didn't perform on that, that Beaulieu
>    failed to do that?
> A. That's correct.
> Q. All right.
> A. I did not get all Beaulieu room scenes.

(Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at Sucher Tr. at 238:9–18.) In response to Mr. Sucher's

email, Ms. Flavin explained:

> The marketing and Research and Development departments have both been
> instructed to give you all their room scene work going forward. The fact that it is
> minimum is sign of the times but [i]t will pick up,

and forwarded the email chain to those departments with instructions to "[p]lease confirm that all

your room scene work is going to Tom Sucher as requested." (Stella Decl. ¶ 25, Exh. W, June-

July 2009 Sucher-Flavin email chain (DX 28).)

Following Ms. Flavin's reply, Mr. Sucher's emails stopped, Mr. Sucher's requests for

additional payment stopped, business between the parties continued and Beaulieu received no

further complaints from Mr. Sucher until he filed suit years later. (Stella Decl. ¶ 25, Exh. W,

June-July 2009 Sucher-Flavin email chain (DX 28); Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at

36:1–19; Stella Decl. ¶ 3, Exh. A, Complaint (DX 3).)

90.     Mr. Sucher admitted and testified to the facts underlying the parties' accord and

satisfaction, including his negotiations with Ms. Flavin, presentations to Beaulieu executives,

and desire to maintain the parties' business relationship, particularly in light of Virtual's financial struggles. Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at 197:13–199:25, 201:1–203:6, 205:18–207:12, 209:18–210:21, 211:6–230:15, 233:23–238:13.

**RESPONSE:** Virtual disputes Beaulieu's ninetieth statement of undisputed material facts. Though Mr. Sucher testified about "negotiations with Ms. Flavin," "presentations to Beaulieu executives," and an attempt to "maintain the parties' business relationship," at no time did he "admit" that the parties entered an "accord and satisfaction" that resolved the parties' dispute. See Virtual's responses to Beaulieu's seventy-seventh, eighty-first, eighty-fifth, and eighty-sixth statements of undisputed material facts.

**<u>REPLY:</u>** This fact is admitted. It is evident not only from Ms. Flavin's and Mr. Sucher's testimony that the parties did, indeed, reach an agreement, and that Virtual initiated the instant suit due to its belief that Beaulieu did not perform on that agreement. For example, Mr. Sucher testified:

A. [Ms. Flavin]said that we would get all Beaulieu room scenes.
Q. And Patricia said that the company would do that for you, right?
A. Yes.
Q. And now your claim is that Beaulieu didn't perform on that, that Beaulieu failed to do that?
A. That's correct.
Q. All right.
A. I did not get all Beaulieu room scenes.

(Stella Decl. ¶ 43, Exh. OO, Sucher Tr. at Sucher Tr. at 238:9–18.) Ms. Flavin testified that, following negotiations with Mr. Sucher, "**<u>I had an understanding and agreement</u>**" with Virtual "to use images, room scenes, and help develop a business relationship with Beaulieu." Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 44:22–25.

Mr. Sucher's contemporaneous actions are further evidence of the parties' agreement: Mr. Sucher's emails stopped, Mr. Sucher's requests for additional payment stopped, business between the parties continued and Beaulieu received no further complaints from Mr. Sucher until he filed suit years later. (Stella Decl. ¶ 25, Exh. W, June-July 2009 Sucher-Flavin email chain (DX 28); Stella Decl. ¶ 42, Exh. NN, Flavin Tr. at 36:1–19; Stella Decl. ¶ 3, Exh. A, Complaint (DX 3).) Virtual's response raises only evidence that is not material to this statement of fact.

92. Beaulieu has incurred and is continuing to incur significant legal fees and costs defending itself against Virtual's complaint. Beaulieu has produced evidence of its partial fees and costs, and will supplement that proof at the conclusion of this matter. Stella Decl. ¶ 54.

**RESPONSE:** Virtual does not dispute Beaulieu's ninety-second statement of undisputed material facts, but in so doing, it does not waive its objection to Beaulieu's continuing failure to provide such documents in discovery despite Virtual's requests.

**REPLY:** Virtual's allegation that Beaulieu has not produced these documents is false. On January 24, 2013, Beaulieu produced its invoices of legal fees and expenses through the end of 2012 (see BEAU 0001814–74) and, as stated, will supplement that proof at the conclusion of this matter.

Dated: April 25, 2013                    Respectfully submitted,


                                         SUTHERLAND ASBILL & BRENNAN LLP

                                         */s/ Ann G. Fort*
                                         Peter N. Farley
                                         Georgia Bar No. 255165

(admitted *pro hac vice*)
Ann G. Fort
Georgia Bar No. 269995
(admitted *pro hac vice*)
Stephanie G. Stella
Virginia Bar No. 77358
(admitted *pro hac vice*)
999 Peachtree Street, N.E., Suite 2300
Atlanta, Georgia 30309-3996
Phone: (404) 853-8000
Facsimile: (404) 853-8806
Email:   peter.farley@sutherland.com
          ann.fort@sutherland.com
          stephanie.stella@sutherland.com

*Attorneys for Defendant Beaulieu Group, LLC*

20742497.1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that an exact copy of this document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt or will be served by first-class postage prepaid mail to the following:

> Michael A. Anderson
> McKinley S. Lundy, Jr.
> Patrick, Beard, Schulman & Jacoway, P.C.
> 537 Market Street
> Suite 202, Market Court
> Chattanooga, Tennessee 37402-1240
> Email: manderson@pbsjlaw.com
>          mlundy@pbsjlaw.com

This 25th day of April, 2013.

/s/ Ann G. Fort
Ann G. Fort

20742497.1